**AFFIDAVIT OF ERIK V. TELFORD**

I, Erik V. Telford, depose and state as follows:

**INTRODUCTION**

1.      I am a Massachusetts State Police Officer with over eighteen (18) years of professional experience.  Currently, I am working as a Sergeant in the Gang Unit as part of the South Eastern Massachusetts Gang Task Force ("the Task Force").  The Task Force consists of Special Agents ("SA") from the Federal Bureau of Investigation ("FBI"), Troopers from the Massachusetts State Police ("MSP") Gang Unit, and Detectives from the Brockton Police Department.  I have been assigned to the Gang Unit for over fifteen (15) years and I have been part of the Task Force for over eight years.

2.      In or about January 2008, I was deputized by the FBI as a federal Task Force Officer ("TFO").  As such, I am also an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code: that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.  Based upon my training and experience as a Massachusetts State Police Trooper and as a Task Force Officer, I am familiar with federal firearms laws.

3.      I have been employed as a State Police Officer since June 2000.  I have been in my current assignment as a Trooper in the Division of Investigative Services ("DIS") since October 2003.  My duties include, but are not limited to, investigating criminal gang organizations and illicit narcotics enterprises, assisting in crime prevention and control in the City of Brockton and other designated high crime areas of the Commonwealth of Massachusetts, the investigation of firearm violations and offenses, and the investigation of narcotic violations and offenses.  I have

1

attended several narcotics seminars and courses including the Drug Enforcement Agency ("DEA") Basic Narcotics Course and Club Drugs, Caliber Press Street Survival Seminar, Pro Active Criminal Enforcement ("PACE"), Fundamentals of Search Warrant Writing and Preparation, Project Safe Neighborhood-Characteristics of an Armed Gunman, Reid School of Interviewing and Interrogation, National Gang Symposium covering gang investigation strategies, gang intelligence, including national gang trends, and Behavioral Observation and Suspicious Activity Recognition certification ("BOSAR").

4. I have participated in over one thousand narcotics arrests and investigations, and firearm arrests and investigations both in uniform patrol and in my current assignment. In addition, I have conducted and assisted in well over one hundred undercover narcotic purchases, surveillance of narcotic transactions, and have participated in numerous search warrant executions involving narcotics and firearms. I have been the affiant in over one hundred (100) search warrants that have led to the seizure of large amounts of cocaine, in base (commonly referred to as "crack") and powder form, heroin, fentanyl, marijuana, various abused prescriptions pills and numerous firearms. I am also personally familiar with the texture, color and appearance of heroin, fentanyl, cocaine, crack, marijuana, abused prescriptions pills and other controlled substances. I have been called to identify all of the above referenced controlled substances in the field on many occasions.

5. I have participated in narcotics and criminal street gang investigations that involved wiretaps, physical surveillance, controlled purchases utilizing undercover officers, confidential informants, and cooperating witnesses, the execution of search warrants, the review of recorded (both audio and video) conversations and criminal activities, and the analysis of telephone, financial and drug records. Through my professional training, education and experience, I have become familiar with the manner in which illegal drugs are prepared, packaged, stored, transported

and distributed as well as the method of payment for such drugs. Through my training, education and experience, I have become familiar with the manner in which narcotics organizations use firearms in furtherance of their narcotics trafficking activity and to protect their members, their narcotics and their narcotics proceeds. I have gained knowledge about the history, membership, and illegal activities of street gangs operating in and around Brockton.

6. I am familiar with the facts and circumstances of this investigation based on information I received from a variety of sources, including but not limited to law enforcement officers and agents, physical surveillance, confidential informants, sources of information, public records, and telephone toll records.

7. Based on my training and experience, I am aware that 18 U.S.C. § 922(g)(1) makes it a federal offense for any individual who has previously been convicted of a crime punishable by imprisonment for a term exceeding one year to possess a firearm or ammunition in or affecting interstate commerce.

8. Having so stated, I make this affidavit in support of a criminal complaint charging Derek Moore with being a felon in possession of a firearm in violation of that statute on July 11, 2018.

9. The statements contained in this affidavit are based on my participation in this investigation, conversations with other agents involved in the investigation, and on information provided to me by agents and officers involved in this investigation. This affidavit is submitted for the limited purpose of establishing probable cause to believe that Derek Moore violated 18 U.S.C. § 922(g)(1) on July 11, 2018. It therefore does not set forth all of the information that I and other law enforcement personnel have obtained during the course of the investigation.

## BACKGROUND OF OPERATION LANDSHARK

10. Operation Landshark is an investigation that identified impact players and repeat offenders in Brockton and Boston. These individuals were targeted utilizing controlled purchases of drugs and firearms using cooperating witnesses ("CWs"). Each defendant has sustained convictions for acts of violence, firearm offenses, and/or drug trafficking. Operation Landshark targeted these defendants because their removal from the streets of Brockton and Boston will result in a significant reduction of the crime rate. Law enforcement believes that many of Operation Landshark's targets are in the top 30 criminal offenders responsible for violent acts and firearm offenses in Brockton. Because of their seasoned experience with law enforcement, most of the targets have insulated themselves from street-level drug deals. Instead, the targets supply street-level dealers with narcotics. Many of the old school offenders are household names to police, informants, and the community. Many high-profile targets have graduated from committing violent acts themselves. Rather, they use the power generated from their reputation and street credibility to direct the younger generation to commit acts of violence against drug dealers competing in the market or infringing on their territory.

11. Given the targets' insulation from easily detected criminal activity, traditional law enforcement methods were ineffective to build solid cases against many of them. As a result, Operation Landshark utilized two trusted associates as CWs, who have long histories with many of these impact players, to conduct controlled buys of drugs and firearms. Since May 2018, CW-1 and CW-2 made controlled purchases of narcotics and firearms from dozens of targets over the course of the operation.[1] As part of the investigation, the FBI bought or seized at least five guns

---

[1] CW-1 began cooperating with law enforcement in January 1018. CW-1 has positively identified numerous individuals involved in drug trafficking, illegal firearm possession, and gang activity. CW-1 has conducted numerous consensually recorded conversations in person and over the telephone. CW-1 has made numerous drug purchases from and recordings of some of the Target Subjects. CW-1 has a

4

and purchased fentanyl, heroin, cocaine and cocaine base.

12. Several of Operation Landshark's targets are impact players who have continuously committed violent acts and firearm offenses. There are also several younger targets who have been identified as impact players in Brockton. These younger targets have also demonstrated a proclivity for violence. In addition, Operation Landshark targeted additional impact players in Boston from whom CW-1 and CW-2 were able to make controlled buys of contraband, such as Derek Moore.

## CONTROLLED PURCHASE OF A FIREARM

13. Derek Moore, 46, resides in Boston, Massachusetts. Moore has a lengthy criminal record with approximately 65 adult entries dating back to 1989. Moore has numerous felony and misdemeanor convictions on his criminal record including the following: Quincy District Court (2015) breaking and entering in the nighttime with intent to commit a felony, breaking and entering in the daytime with intent to commit a felony, and larceny; Dorchester District Court (2006) Abuse Prevention Act violation (4 counts), and intimidation of a witness; Dorchester District Court (2004) assault and battery – 2 separate convictions; Dorchester District Court (2002) Abuse Prevention Act violation (2 counts), malicious destruction of property, and resisting arrest; Dorchester District Court (2001) leaving the scene with personal injury and property damage; Suffolk Superior Court (1992) threats with extortion; Roxbury District Court (1992) possession of a dangerous weapon; and Suffolk Superior Court (1990) distribution of a Class B controlled substance (2 counts). Moore has received numerous sentences of incarceration including 10 years

---

criminal history containing counterfeiting, larceny, uttering, resisting arrest, disorderly conduct, assault, firearms controlled substance, armed robbery, and murder. The information that CW-1 provided has been corroborated by the controlled drug purchases and by the investigation generally. Law enforcement considers the information provided by CW-1 to be reliable. CW-1 has received consideration in the form of financial assistance in connection with his/her cooperation.

on one of his 1990 drug distribution cases and 5 years from and after on the second 1990 drug conviction. Moore also received a sentence of 3 to 5 years in 1993 on his threats with extortion conviction; 2 years on his 2004 assault and battery conviction; and 2 years on his 2006 Abuse Prevention Act conviction. He received several other shorter sentences. Moore has 9 restraining orders on his record. Having been convicted of a crime punishable by imprisonment of a term exceeding one year, it is a violation of 18 U.S.C. § 922(g)(1) for Moore to possess a firearm.

14. On June 27, 2018, CW-1 sent the following text message to Moore: "What's good nephew anything. I really need another pair of boots." It appears that Moore did not respond. On July 10, 2018, CW-1 sent the following text message to Moore: "Any new sneakers or boots." Two minutes later, the following text was sent from Moore's phone to CW-1: "Well yeah but they ain't new kinda worn I'll let you see em. When are YOU around." CW-1 responded: "2morro and I have dough just give me a good deal." Moore's phone replied: "Yup." CW-1 then responded: "I'll hit you up 2morro afternoon." Law enforcement took photos of the above-described text messages from CW-1's phone.[2]

15. On July 11, 2018, at about 5:00 p.m., CW-1 and CW-2 met law enforcement at a prearranged location. During the meeting, the CWs were searched for contraband with negative results, their vehicle was searched for contraband with negative results, the CWs were equipped with transmitters and recording devices, and provided with $400 to purchase a firearm from Moore.

---

[2] I have described the phone with which CW-1 communicated as "Moore's phone," but CW-1's phone directory lists the number belonging to "Scientific," which according to CW-1 is a nickname used by Moore.

16.     At about 5:16 p.m., the CWs departed the staging area in their vehicle. They were followed by law enforcement to Intervale Street in Boston, where Moore resided. Once on Intervale Street, CW-1 called Moore and Moore told CW-1 to go to the "white door."

17.     At about 5:27 p.m., surveillance agents observe CW-1 exit the vehicle. At about 5:29 p.m., CW-1 entered Moore's residence and met with Moore. Surveillance agents monitored what occurred inside the residence by way of the audio/video transmitter worn by CW-1. CW-1 exited Moore's residence at about 5:37 p.m., returned to the vehicle where CW-2 was waiting, and drove back to the meet location, where law enforcement took possession of the Highpoint Model C, 9mm, semiautomatic handgun, with an obliterated serial number, and a magazine containing four 9 mm bullets, Moore sold to CW-1.

18.     During a debriefing, CW-1 recounted that he entered Moore's apartment, met with Moore, and purchased the firearm from Moore. According to CW-1, Moore stated that the firearm came from Georgia and that Moore and others traveled to Georgia to bring guns back to Massachusetts. Moore also stated that he would call some of the individuals with whom he traveled to Georgia to see if any of them still had a "big gun" with a "50 round" magazine.

19.     Law enforcement recently showed a photo array, which included a photo of Moore, to CW-1. CW-1 selected the photo of Moore and identified him as the man from whom he purchased the firearm. CW-1 noted that he/she has known Moore for months.

20.     Law enforcement consulted with Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent Mattheu Kelsch, a certified ATF firearm interstate nexus expert, who informed law enforcement that the Highpoint Model C, 9mm, semiautomatic handgun was manufactured outside of Massachusetts. I also know that the firearm sold by Moore to CW-

1 was examined by law enforcement with the Federal Bureau of Investigation and the ATF and meets the federal definition of a firearm.

## **CONCLUSION**

21.     Based on the foregoing, I submit that there is probable cause to believe that, on July 11, 2018, Derek Moore, having been previously convicted of a crime punishable by a term of imprisonment exceeding one year, did possess, in and affecting interstate commerce, a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).

I declare that the foregoing is true and correct to the best of my knowledge and belief.

_____
ERIK V. TELFORD
Task Force Officer, FBI

Subscribed and sworn to before me
this 22nd day of August, 2018

_____
HON. DONALD L. CABELL
UNITED STATES MAGISTRATE JUDGE

